IN THE UNITED STATES DISTRICT COURT WESTERN DISTRICT OF PENNSYLVANIA

MONTE D. BLAIR                                                          Docket No:

    *Plaintiff*

v.                                                                      JURY TRIAL DEMANDED

CITY OF PITTSBURGH, CITY OF PITTSBURGH
BUREAU OF POLICE, REGINA MCDONALD, NATE HARPER,
OFFICER CHRISTOPHER KERTIS, OFFICER ANDREW BAKER,
DETECTIVE SCOTT EVANS

    *Defendants*.

## COMPLAINT:

Plaintiff Monte D. Blair makes the following representations to this Court against the named Defendants as follows:

## PARTIES:

1. Plaintiff Monte D. Blair is an adult individual who, at all times relevant hereto resided in the County of Allegheny and City of Pittsburgh.
2. Defendant, City of Pittsburgh, (hereinafter referred to as "City") is a municipal corporation within the Commonwealth of Pennsylvania, with administrative offices located at 414 Grant Street, 5th Floor, Room 512, Allegheny County, Pennsylvaina, 15219.

3. Defendant City of Pittsburgh Bureau of Police is part of the Department of Public Safety and charged with the supervision, training and discipline of the police for the City of Pittsburgh having its principal office located at 1203 Western Avenue, Pittsburgh, Pennsylvania 15233.

4. Defendant, Regina McDonald, is an individual who hoeld the position of acting Chief of the City of Pittsburgh Bureau of Police. During the time in question, when she was not acting as Chief of Police but prior to the time she took the position, she was involved in the formulation of policy, procedures, and guidelines for the officers of the City of Pittsburgh Police Department, including but not limited to: traffic stops, use of force, and the use of deadly force.

5. Defendant, Nate Harper is an individual who was the Chief of Police at the time of the incident. He has subsequently resigned due to unrelated matters. In such capacity as Chief of Police, he was charged with the supervision, direction, and control of the Officers of the City of Pittsburgh traffic stops, use of force, and use of deadly force.

6. Defendant Christopher Kertis, at all times relevant hereto, is an individual who is employed as a police officer by the City of Pittsburgh. This action is brought against the named individual in his individual and in his official capacity as a police officer of the City of Pittsburgh.

7. Defendant, Andrew Baker, at all times material herto, is an individual who is employed as a police officer by the City of Pittsburgh. This action is brought against the named individual in his individual and in his official capacity as a police officer of the City of Pittsburgh.

8. Defendant, Scott Evans, at all times material hereto, is an individual who is employed as a Detective by the City of Pittsburgh. This action is brought against the named individual in his individual and in his official capacity as a Detective for the City of Pittsburgh.

## JURISDICTION:

9. This cause of action arises under the United States Constitution, particularly under the provisions of the Fourth and Fourteenth Amendments to the United States Constitution, and under the laws of the United States, particularly under the Civil Rights Act, Title 42 of the United States Code, Section 1983, Jurisdiction is conferred upon this court under the provisions of Title 28 of the United States Code, Section 1331, 1334 and 1367 ( a ). Allegations of excessive force are examined under the Fourth Amendment's prohibition on unreasonable seizures applicable to the States and individual acting in their official and individual capacity by the Fourteenth Amendment of the United States Constitution,

10. It is also submitted that the pendant jurisdiction of this Court is invoked over all state court claims in view of the common nucleus of operative facts as to all claims.

## FACTUAL ALLEGATIONS:

11. The City of Pittsburgh is a governmental entity organized and exsisting under the laws of the Commonwealth of Pennsylvaina. In turn, the City of Pittsburgh is responsible for the development, operation, and supervision of the policing powers.

12. The City of Pittsburgh Bureau of Police is responsible for setting policy, procedures and directives for the operation of its Police Officers and to ensure that policies, procedures and directives established are enforced for the exercise of their police duties; and, are responsible for the development and implementation of policies and procedures concerning the selection, evaluation, training and supervision of individuals employed as police

officers. This includes when; under what circumstances; and in what manner an officer is permitted to use force against an individual including the use of a firearm.

13. Defendants Kertis, Baker, and Evans are officers of the City of Pittsburgh Bureau of Police assigned to the patrol of the Zone 5 area of the City of Pittsburgh. In such capacity, Defendants Kertis, Baker, and Evans are charged with the enforcement of the laws of the Commonwealth of Pennsylvaina, in a fair, just and equitable manner consistent with the rights afforded all individuals by the Constitution of the United States of America and the Commonwealth of Pennsylvaina, and, were acting, at all times relevant hereto, under the color of law and color of their authority as police officers and a Detective of the City of Pittsburgh.

14. The City of Pittsburgh should have established or enforced established policies, procedures and/or guidelines concerning the nature of the conduct and interaction of any Police Officer has with any individual in the discharge of their duties; and, in paticular, in the manner in which incidents are investigated; when individuals are to be taken into custody and or arrested; when traffic stops are to be effectuated; how traffic stops should be conducted, and, when; under what circumstances, and in what manner an officer is permitted to use force against an individual including the use of a firearm. Additionally, policies, procedures and/or guidelines exist or should have existed concerning the review and supervision of the actions of individual officers to insure that they were conforming to established Police Department policies, procedures and/or guidelines and were discharging their duties in an appropriate and lawful manner.

15. On or about September 9, 2012 at approximately 0230 hours, Defendants Kertis and Baker were traveling on Hamilton Ave in the Homewood section

of Pittsburgh when they alleged to have heard and saw shots being fired several streets over on Zenith and Fleury Way from a "dark SUV". Court records have established that at this point the officers are several hundred feet away from the area where gun shots were being fired. These trained officers were never able to ascertain the exact make, model or color of the vehicle that they witnessed the "muzzle flash" coming from.

16. At the time the officers were tending to a group of intoxicated women in the parking lot of one of the five bars that were letting out at the time in the area. After hearing the shots, the officers have testified that they exited the parking lot, turned back onto Hamilton Avenue, made a right onto Zenith Way, which is described as a "zig-zag" alley way with a view that is obstructed by PNC Bank, and eventually come to a stop behind the PNC Bank on Zenith Way. During the time it took the officers to leave Hamilton Avenue and arrive behind PNC Bank they lost sight of the "dark SUV" and the gunfire had stopped.

17. PNC Bank surveillance video shows the Police Van that Officer Kertis and Baker were driving coming to a halt behind the bank, never putting on any takedown lights or activating any sirens to indicate that they were in pursuit of anyone. Also by not activating their sirens or takedown lights, it also prevents the dash camera from being activated.

18. At the same time as the officers were approaching PNC Bank, the Plaintiff Monte' Blair was leaving "The Purple Room" Banquet Hall, located at the intersection of Kelly Street and Zenith Way. He was one of the hundreds of patrons leaving a private party that evening at that time. He entered his vehicle which was parked on Kelly Street, and proceeded onto Zenith Way.

He noticed a Police Van sitting near the end of the alleyway with no lights or sirens on. He did as any normal driver would and slowly went around the Police Van.

19. While the officers were sitting in their van, the PNC Bank surveillance video shows a vehicle slowly and cautiously approach the cruiser yielding the officer's the right of way in the alleyway and proceed to go around the Van on the passenger side.

20. After the vehicle passes the Police Van, the passenger of the Van, Officer Baker opens his door and open fires on the vehicle. At the same time, Officer Kertis exits the driver side of the Van, walks to the back of the police Van and begins to fire upon the vehicle from the rear of the police van.

21. Both officers have admitted to emptying their gun clips into the vehicle that passed them in the alleyway. All of the ballistic reports examining shell casings recovered at the scene of the alleged incident have been reviewed and tested. All of the ballistic reports identify the shell casings recovered are from the firearms belonging to Officers Kertis and Baker. No other shell casing was ever recovered other than the officers casings.

22. Essentially, the officers opened fire on a vehicle without even attempting to stop the vehicle or give any indication that they were in pursuit of the vehicle , ..i.e.  activating lights, sirens, or any verbal command to stop.

23. Not only did these officers open fire on a vehicle without warning, they did so at 2:30 a.m,   In an area with at least five bars closing and hundreds of

patrons leaving the area, unaware of any disturbance that may have occurred prior. Which is extremely reckless conduct.

24. The officers allege in the criminal complaint that the vehicle tried to "ram" the Police Van and fired shots at them, but this allegation is clearly false and evidenced as false in the PNC Surveillance video and in the 911 calls made by the officers immediately after the incident.

24. A copy of 911 calls concerning the incident shows numerous inconsistencies appear between the 911 calls and the averments made by the Pittsburgh Police in the affidavit to the arrest warrant attested to and requested by Detective Scott Evans.

25. On the 911 dispatch recordings from the incident, Officer Baker and Officer Kertis can be heard informing the dispatch officer and his fellow officers responding to the call that the reason for the pursuit of this "dark SUV" was because the SUV "tried to ram" them. Which is clearly false based upon the PNC Bank surveillance video. There was never any mention of the suspect in the SUV actually firing at the officers on the 911 dispatch recordings.

26. The false allegations of shots being fired at the officers was not reported until Detective Scott Evans came upon the scene and began to create false reports in direct contradiction of the physical evidence on the scene.

27. Officer Baker and Kertis both admit to "emptying their gun clips" while shooting at a vehicle that already passed them and did not pose an immediate threat to their safety or the safety of any other person.

28. Five of those numerous shots entered the rear of the Plaintiff's body.

See Police Photos taken the day of Plaintiff's arrest. It is impossible for a fleeing suspect to be considered a threat to anyone.

29.     As a result of being shot by these officers, the Plaintiff has had three major surgeries. The surgeons had to totally reconstruct his elbow leaving him with 12 screws and a limited range of motion. The Plaintiff suffers from permanent rotator cup damage with daily pain in both areas and may have to undergo extensive surgical procedures in the future.

30.     As a direct and proximate result of the actions of the Defendants, Monte' Blair has been subjected to and may hereafter be subject to great pain, suffering and inconvenience; he was required to undergo painful diagnostic tests and treatment for his injuries, he may have sustained an aggravation of pre-existing injuries or conditions; he has sustained emotional and psychological difficulties; he has sustained a loss of earnings and his earning power has been permanently impaired; he sustained other injuries, losses and damages. He has experienced grief, anxiety, depression and nervousness. He suffered scarring and disfigurement. He has incurred and may hereafter incur expenditured for medical care and kindred expenditures.

**ARGUMENT:**

31.     To prevail on a Fourth Amendment excessive force claim, a plaintiff must establish: (1) an injury (2) That the injury resulted directly from the use of excessive force; and (3) That the excessiveness of the force was unreasonable.

32.     The defendants in this case heard and saw shots from several hundred feet away and several streets over. The officers were never able to positively identify the make, model, or color of the vehicle firing the shots, they only referred to it as a "dark colored SUV"

33.     The officers were tending to drunk women leaving a bar at the time that they heard the shots being fired. As they left that scene, they lost sight of the "dark colored SUV" for several moments.

34.     When they arrived behind PNC Bank, the shooting incident that they initially observed was over. It was 2:30 am on a Saturday evening and at least five bars were closing and hundreds of patrons were leaving. There were certainly numerous "dark colored" SUV's in the immediate area. In fact, officers responding to the incident can be heard on the 911 dispatch recordings stating that immediately after the incident they were pursuing and directly behind three dark-colored SUV's at that moment.

35.     The defendant officers opened fire on the first "dark-colored" SUV they saw without providing any warning or activating any lights or sirens. The officers waited until the vehicle passed them and they were clearly not in any immediate danger that would justify the use of deadly force.

36.     The law is clear that deadly force should never be used against a fleeing suspect that does not pose an immediate threat to an officer's safety or the safety of others in the area. See **Haugen v. Brosseau, 351 F. 3d 372 - Court of Appeals, 9th Circuit 2003.** , See also Hopkins v. Andaya, 958 F.2d 881(9th Cir. 1992).

37. Based on the totality of the circumstances, the use of deadly force by Officer Kertis and Officer Baker in shooting Monte' Blair five times in the rear of his body was not appropriate or reasonable in nature and constituted an excessive use of force against him in violation of the rights and immunities guaranteed to the plaintiff by the Fourteenth and Fourth Amendments of the United States Constitution. As well as the subsequent false reports created by Detective Scott Evans.

38. The City of Pittsburgh Bureau of Police failed to have established and/or enforced established policies, procedures and/or guidelines concerning the nature of conduct and interaction any Police Officer has with any individual in the discharge of their duties, and the paticular manner in which incidents are investigated; and in what manner an officer is permitted to use force against an individual including the use of a firearm and other means of force.

39. The City of Pittsburgh failed to have established and/or enforced established policies, procedures and/or guidelines concerning the nature of conduct and interaction any Police Officer in it's Police Department has with any individual in the discharge of their duties, and the paticular manner in which incidents are investigated; and in what manner an officer is permitted to use force against an individual including the use of a firearm and other means of force.

40. The acts of the Defendants, as set forth in this complaint, were done willfully, maliciously and/or with a callous disregard and reckless indifference to and disregard of the rights, immunities and privileges guaranteed to Monte' D. Blair by the Fourth and Fourteenth Amendments to the United States Constitution.

WHEREFORE, Monte' D. Blair asks for the entrance of judgment against the Defendants, individually and jointly, as follows:

a. compensatory damages in an amount to be determined by this Court to be just, fair and reasonable;

b. punitive damages;

c. prejudgment and post judgment interest;

d. the costs incurred in the prosecution of this matter

e. reasonable counsel fees; and

f. such other and further relief as the Court deems just and appropriate.

Respectfully Submitted

s/ Jenee' N. Oliver, Esq.
PA ID #200374

P.O. Box 17024
Penn Hills, PA 15235
(412) 773-5374