IN THE UNITED STATES DISTRICT COURT WESTERN DISTRICT OF PENNSYLVANIA

MONTE D. BLAIR                                                          Docket No:

    *Plaintiff*

v.                                                                              JURY TRIAL DEMANDED

CITY OF PITTSBURGH, CITY OF PITTSBURGH
BUREAU OF POLICE, REGINA MCDONALD, NATE HARPER,
OFFICER CHRISTOPHER KERTIS, OFFICER ANDREW BAKER,
DETECTIVE SCOTT EVANS; COMMANDER THOMAS STRANGECKI

    *Defendants.*

## SECOND AMENDED COMPLAINT:

Plaintiff Monte D. Blair makes the following representations to this Court against the named Defendants as follows:

## PARTIES:

1. Plaintiff Monte D. Blair is an adult individual who, at all times relevant hereto resided in the County of Allegheny and City of Pittsburgh.

2. Defendant, City of Pittsburgh, (hereinafter referred to as "City") is a municipal corporation within the Commonwealth of Pennsylvania, with administrative offices located at 414 Grant Street, 5th Floor, Room 512, Allegheny County, Pennsylvaina, 15219.

3. Defendant City of Pittsburgh Bureau of Police is part of the Department of Public Safety and charged with the supervision, training and discipline of the police for the City of Pittsburgh having its principal office located at 1203 Western Avenue, Pittsburgh, Pennsylvania 15233.

4. Defendant, Regina McDonald, is an individual who held the position of acting Chief of the City of Pittsburgh Bureau of Police at the time of the initial filing of this complaint. During the time in question, when she was not acting as Chief of Police but prior to the time she took the position, she was involved in the formulation of policy, procedures, and guidelines for the officers of the City of Pittsburgh Police Department, including but not limited to: traffic stops, use of force, and the use of deadly force.

5. Defendant, Nate Harper is an individual who was the Chief of Police at the time of the incident. He has subsequently resigned due to unrelated matters. In such capacity as Chief of Police, he was charged with the supervision, direction, and control of the Officers of the City of Pittsburgh traffic stops, use of force, and use of deadly force.

6. Defendant Christopher Kertis, at all times relevant hereto, is an individual who is employed as a police officer by the City of Pittsburgh. This action is brought against the named individual in his individual and in his official capacity as a police officer of the City of Pittsburgh.

7. Defendant, Andrew Baker, at all times material herto, is an individual who is employed as a police officer by the City of Pittsburgh. This action is brought against the named individual in his individual and in his official capacity as a police officer of the City of Pittsburgh.

8. Defendant, Scott Evans, at all times material hereto, is an individual who is employed as a Detective by the City of Pittsburgh. This action is brought against the named individual in his individual and in his official capacity as a Detective for the City of Pittsburgh.

**JURISDICTION:**

9. This cause of action arises under the United States Constitution, particularly under the provisions of the Fourth and Fourteenth Amendments to the United States Constitution, and under the laws of the United States, particularly under the Civil Rights Act, Title 42 of the United States Code, Section 1983, Jurisdiction is conferred upon this court under the provisions of Title 28 of the United States Code, Section 1331, 1334 and 1367 ( a ). Allegations of excessive force are examined under the Fourth Amendment's prohibition on unreasonable seizures applicable to the States and individual acting in their official and individual capacity by the Fourteenth Amendment of the United States Constitution,

10. It is also submitted that the pendant jurisdiction of this Court is invoked over all state court claims in view of the common nucleus of operative facts as to all claims.

## II.    PROCEDURAL HISTORY:

1.    The Plaintiff, while incarcerated filed a complaint on September 5, 2014, alleging the same claims and arising from the same set of facts. Blair v. City of Pittsburgh, 14-cv-1207 (W.D.Pa. Oct. 9, 2014).

2.    This original filing included a request from Plaintiff's Attorney to extend the amount of time to file an IFP Petition. The reason for the request was that the Plaintiff was "in transit" within the Pennsylvania Department of Corrections. The Plaintiff is also simultaneously serving time in the Federal Bureau of Prisons. Because of the unusual circumstances, and the fact that the Plaintiff has been housed in at least five different correctional institutions within the prior six month period, it would be impossible to get an Inmate Account statement in a timely manner.

3. This Honorable Court ordered that the Court would dismiss the Complaint on October 9, 2014 if the IFP Petition was not filed or Filing fees were not paid.

4. The Plaintiff was still in Transit during this time with limited access to phone, mail and his property in order to properly respond to his Attorney and complete the IFP Petition.

5. The Plaintiff's family members attempted to pay the filing fee on his behalf on October 9, 2014. The payment was made to the Clerk of Courts via Debit Card over the Telephone at or around 3pm on October 9, 2014.

6. This payment was later deemed untimely and the he Court dismissed the case without prejudice by Order dated October 9, 2014.

7. Plaintiff refiled on October 29, 2014. The full filing fee was attached to the filing.

8. All Police Officer defendants were served via Certified mail mailed December 15, 2014 to Pittsburgh Police Headquarters at 1203 Western Ave, Pgh, Pa 15233. All officers were/are employees/agents of the Pittsburgh Police department as such Pittsburgh Police Headquarters was the appropriate place to attempt service. See *Federal Rule 4 e(2) (c)Serving an Individual Within a Judicial District of the United States* .

9. A confirmation that the complaint was delivered and accepted is attached to this motion as **Exhibit 1**. Delivery was confirmed by the United States Post Office on December 15, 2015

10. Plaintiff file an Amended Complaint on February 17, 2015.

11. Defendants City of Pittsburgh responded on February 26, 2015 stating among other things that the Officers Defendant's were not properly served..

11. The initial filing by Defendant on September 5, 2014 tolled the applicable Statute of limitations (Blair v. City of Pittsburgh, 14-cv-1207 (W.D.Pa. Oct. 9, 2014)).

12. 42 U.S.C. § 1983 contains no statute of limitations, the appropriate state statute-of-limitations period applies. In *Richardson v. Diagnostic Rehabilitation Center*, it was held that **even where *in forma pauperis* motion is denied statute of limitations is tolled so long as motion was filed in good faith**. *Richardson v. Diagnostic Rehabilitation Center*, 836 F. Supp. 252, 254 (E.D. Pa. 1993) *See also Jones v. Waters, 563 F. Supp. 817, 818 (E.D. Pa. 1983)* .

13. The motion filed by the Plaintiff was filed in good faith. The Plaintiff made every attempt possible under the circumstances to comply with the deadline imposed by the Court to complete the IFP Petition but he was was unsuccessful. In order to properly comply with the IFP Petition, the Plaintiff would have had to provide the Court with a Inmate Account record going back at least six months prior to the filing of the complaint from every institution the Plaintiff was housed in by October 9, 2015.

14. During the preceding six months of filing the complaint, the Plaintiff was in Transit within several state and federal correctional institutions during the preparation and initial filing of this complaint. Starting with Allegheny County Jail , moving to North East Ohio Correctional Center in Youngstown, Ohio, at which the Defendant was in Federal custody. Plaintiff then moved back to Allegheny county Jail , then moving to State Correctional Institute-Pittsburgh, then to SCI-Camp Hill, finally to SCI-Huntingdon.

15. At each of these institutions a commissary account was created and would have to been accounted for to properly reply to IFP Petition. This was not possible under the time constraints and without assistance of Plaintiff, who was in

transit. However, the Plaintiff still attempted to make requests to each and every institution to attempt to get the information to provide to the Court.

16. While waiting on this information, in a further act of good faith the Plaintiff and his Attorney reached out to the Plaintiff's family members to assist in paying the full filing fee.

17. On October 9, 2014, the date indicated that the Complaint would be dismissed if not paid if the entire filing fee had not been paid, Counsel reviewed the docket and noticed that IFP information had not been received. Counsel reached out to the Plaintiff's family and the full filing fee was paid by the Defendant's family members.

18. The filing fee was paid to the Clerk of Courts via Debit Card over the telephone, by one of Plaintiff's relatives. This payment was accepted by the Clerk of Court . The transaction went through the relatives bank account.

19. At some point, later that day, the Clerk of Court was directed to reject the payment and issue a refund. The refund process takes up to a week or longer depending on the banking institution used. As soon as the money was available to Plaintiff and his family again, the complaint was refiled with full filing fee being paid rendering the prior IFP Petition moot.

20. The amount of time between the dismissal and the refiling was not unreasonable. When this Honorable dismissed this case without Prejudice, the Court did not indicate a specific time period for refiling. All relevant case law on this issue do not indicate a specific time period, rather rely on a "reasonable standard".

21. Less than 21 days to refund a filing fee and refile via Bank debit card is not unreasonable. It would be unjust and unreasonable for this Honorable Court to impose one or adopt the Defendants position that the delay between dismissal and refiling was inexcusable, as he was at the

mercy of several banking institutions.

22.     The fact that the Plaintiff was attempting to file IFP should indicate that neither he or his family members have a lot of disposal income. Therefore, the Plaintiff and his Counsel had to wait until the money was released to his family by the bank to refile the complaint.

23.     Accordingly, the statute of limitations tolled when the Plaintiff submitted his *in forma pauperis* motion with his complaint on September 5, 2014, in good faith, and his action is not time-barred.

24. Although the Plaintiff was convicted of lesser charges stemming from this incident, The *Heck* case limitation does not apply in this case as Mr. Blair was **Acquitted** of 2 counts of Criminal Attempted Homicide against Officer Baker and Kertis. Mr. Blair was also **Acquitted** of 2 counts of Assault of a Law-enforcement Officer against Officer Baker and Kertis. (See Docket-CP-02-CR-0014190-2012, Page 4, Attached as **Exhibit 2** to this Brief).

25.     This distinction is important as a close reading of the Plaintiff's complaint would show that Mr. Blair is stating that as he slowly drove past the officer's van, essentially, the officers opened fire on a vehicle without even attempting to stop the vehicle or give any indication that they were in pursuit of the vehicle , ..i.e.  activating lights, sirens, or any verbal command to stop. The officers then continued to fire upon his vehicle as he was attempting to leave the area.  Five of those numerous shots entered the rear of the Plaintiff's body. See Police Photos taken the day of Plaintiff's arrest. (**Exhibit 3**)It is impossible for a fleeing suspect to be considered a threat to anyone.

26.     The situation that resulted in the Aggravated Assault convictions was a separate situation and was clearly over, as suspect was attempting to leave the area. Therefore the *Heck* case does not apply to this situation. See also *Green v. Chvala*, No. 13-3568, 2014 WL 2925182 (7th Cir. June 30, 2014), where the Court discusses the limitations of *Heck*.where gun shots were being fired. These

trained officers were never able to ascertain the exact make, model or color of the vehicle that they witnessed the "muzzle flash" coming from.

27. At the time the officers were tending to a group of intoxicated women in the parking lot of one of the five bars that were letting out at the time in the area. After hearing the shots, the officers have testified that they exited the parking lot, turned back onto Hamilton Avenue, made a right onto Zenith Way, which is described as a "zig-zag" alley way with a view that is obstructed by PNC Bank, and eventually come to a stop behind the PNC Bank on Zenith Way. During the time it took the officers to leave Hamilton Avenue and arrive behind PNC Bank they lost sight of the "dark SUV" and the gunfire had stopped.

28. PNC Bank surveillance video shows the Police Van that Officer Kertis and Baker were driving coming to a halt behind the bank, never putting on any takedown lights or activating any sirens to indicate that they were in pursuit of anyone. Also by not activating their sirens or takedown lights, it also prevents the dash camera from being activated.

29. At the same time as the officers were approaching PNC Bank, the Plaintiff Monte' Blair was leaving "The Purple Room" Banquet Hall, located at the intersection of Kelly Street and Zenith Way. He was one of the hundreds of patrons leaving a private party that evening at that time. He entered his vehicle which was parked on Kelly Street, and proceeded onto Zenith Way. He noticed a Police Van sitting near the end of the alleyway with no lights or sirens on. He did as any normal driver would and slowly went around the Police Van.

30. While the officers were sitting in their van, the PNC Bank surveillance video shows a vehicle slowly and cautiously approach the cruiser yielding the officer's the right of way in the alleyway and proceed to go around the Van on the passenger side.

31. After the vehicle passes the Police Van, the passenger of the Van, Officer Baker opens his door and open fires on the vehicle. At the same time, Officer Kertis exits the driver side of the Van, walks to the back of the police Van and begins to fire upon the vehicle from the rear of the police van.

32. Both officers have admitted to emptying their gun clips into the vehicle that passed them in the alleyway. All of the ballistic reports examining shell casings recovered at the scene of the alleged incident have been reviewed and tested. All of the ballistic reports identify the shell casings recovered are from the firearms belonging to Officers Kertis and Baker. No other shell casing was ever recovered other than the officers casings.

33. Essentially, the officers opened fire on a vehicle without even attempting to stop the vehicle or give any indication that they were in pursuit of the vehicle , ..i.e.  activating lights, sirens, or any verbal command to stop.

34. Not only did these officers open fire on a vehicle without warning, they did so at 2:30 a.m,  In an area with at least five bars closing and hundreds of patrons leaving the area, unaware of any disturbance that may have occurred prior. Which is extremely reckless conduct.

35. The officers allege in the criminal complaint that the vehicle tried to "ram" the Police Van and fired shots at them, but this allegation is clearly false and evidenced as false in the PNC Surveillance video and in the 911 calls made by the officers immediately after the incident.

36. A copy of 911 calls concerning the incident shows numerous inconsistencies appear between the 911 calls and the averments made by the Pittsburgh Police in the affidavit to the arrest warrant attested to and requested by Detective Scott Evans, and approved by his Commander Thomas Strangecki.

37. On the 911 dispatch recordings from the incident, Officer Baker and Officer Kertis can be heard informing the dispatch officer and his fellow officers responding to the call that the reason for the pursuit of this "dark SUV" was because the SUV "tried to ram" them. Which is clearly false based upon the PNC Bank surveillance video. There was never any mention of the suspect in the SUV actually firing at the officers on the 911 dispatch recordings.

38. The false allegations of shots being fired at the officers was not reported until Detective Scott Evans came upon the scene and began to create false reports in direct contradiction of the physical evidence on the scene. These false reports by Detective Evans were seen and approved by his Commander Thomas Strangecki.

39. Officer Baker and Kertis both admit to "emptying their gun clips" while shooting at a vehicle that already passed them and did not pose an immediate threat to their safety or the safety of any other person.

40. Five of those numerous shots entered the rear of the Plaintiff's body.

Evidenced by the Photos taken the day of Plaintiff's arrest. It is impossible for a fleeing suspect to be considered a threat to anyone.

41. As a result of being shot by these officers, the Plaintiff has had three major surgeries. The surgeons had to totally reconstruct his elbow leaving him with 12 screws and a limited range of motion. The Plaintiff suffers from permanent rotator cup damage with daily pain in both areas and may have to undergo extensive surgical procedures in the future.

42. As a direct and proximate result of the actions of the Defendants, Monte' Blair has been subjected to and may hereafter be subject to great pain, suffering and inconvenience; he was required to undergo painful diagnostic tests and treatment for his injuries, he may have sustained an aggravation of pre-existing injuries or conditions; he has sustained emotional and psychological difficulties; he has sustained a loss of earnings and his earning power has been permanently impaired; he sustained other injuries, losses and damages. He has experienced grief, anxiety, depression and nervousness. He suffered scarring and disfigurement. He has incurred and may hereafter incur expenditured for medical care and kindred expenditures.

## **ARGUMENT:**

1. To prevail on a Fourth Amendment excessive/deadly force claim, a plaintiff must establish: (1) an injury (2) That the injury resulted directly from the use of excessive /deadly force; and (3) That the excessiveness of the force was unreasonable.

2. The defendants in this case heard and saw shots from several hundred

feet away and several streets over. The officers were never able to positively identify the make, model, or color of the vehicle firing the shots, they only referred to it as a "dark colored SUV"

3.      The officers were tending to drunk women leaving a bar at the time that they heard the shots being fired. As they left that scene, they lost sight of the "dark colored SUV" for several moments.

4.      When they arrived behind PNC Bank, the shooting incident that they initially observed was over. It was 2:30 am on a Saturday evening and at least five bars were closing and hundreds of patrons were leaving. There were certainly numerous "dark colored" SUV's in the immediate area. In fact, officers responding to the incident can be heard on the 911 dispatch recordings stating that immediately after the incident they were pursuing and directly behind three dark-colored SUV's at that moment.

5.      The defendant officers opened fire on the first "dark-colored" SUV they saw without providing any warning or activating any lights or sirens. The officers waited until the vehicle passed them and they were clearly not in any immediate danger that would justify the use of deadly force.

6.      The law is clear that deadly force should never be used against a fleeing suspect that does not pose an immediate threat to an officer's safety or the safety of others in the area. See **Haugen v. Brosseau, 351 F. 3d 372 - Court of Appeals, 9th Circuit 2003.** , See also Hopkins v. Andaya, 958 F.2d 881(9th Cir. 1992).

7.      Based on the totality of the circumstances, the use of deadly force by Officer Kertis and Officer Baker in shooting Monte' Blair five times in the rear of his body was not appropriate or reasonable in nature and constituted an excessive use of force against him in violation of the rights and immunities guaranteed to the plaintiff by the Fourteenth and Fourth Amendments of the United States Constitution. As well as the subsequent

false reports created by Detective Scott Evans.

8. The City of Pittsburgh Bureau of Police failed to have established and/or enforced established policies, procedures and/or guidelines concerning the nature of conduct and interaction any Police Officer has with any individual in the discharge of their duties, and the paticular manner in which incidents are investigated; and in what manner an officer is permitted to use force against an individual including the use of a firearm and other means of force.

9. The City of Pittsburgh failed to have established and/or enforced established policies, procedures and/or guidelines concerning the nature of conduct and interaction any Police Officer in it's Police Department has with any individual in the discharge of their duties, and the paticular manner in which incidents are investigated; and in what manner an officer is permitted to use force against an individual including the use of a firearm and other means of force.

10. The acts of the Defendants, as set forth in this complaint, were done willfully, maliciously and/or with a callous disregard and reckless indifference to and disregard of the rights, immunities and privileges guaranteed to Monte' D. Blair by the Fourth and Fourteenth Amendments to the United States Constitution.

WHEREFORE, Monte' D. Blair asks for the entrance of judgment against the Defendants, individually and jointly, as follows:

a. compensatory damages in an amount to be determined by this Court to be just, fair and reasonable;

b. punitive damages;

c. prejudgment and post judgment interest;

d. the costs incurred in the prosecution of this matter

e. reasonable counsel fees; and

f. such other and further relief as the Court deems just and appropriate.

Respectfully Submitted

s/ Jenee' N. Oliver, Esq.
PA ID #200374

P.O. Box 17024
Penn Hills, PA 15235
(412) 773-5374