## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **MONTE D. BLAIR** | **:** | **CIVIL ACTION** |
| | **:** | |
| **v.** | **:** | **NO. 14-1473** |
| | **:** | |
| **CITY OF PITTSBURGH,** *et al.* | **:** | |

**KEARNEY, J.**                                                    **October 28, 2016**

### MEMORANDUM

After hearing and seeing gunshots discharged from a dark-colored SUV shortly after 2:00 A.M. on a Sunday morning, Pittsburgh police officers chased and then encountered a dark-colored SUV vehicle driving towards their marked police van at a high rate of speed in an alleyway. The SUV driver did not slow down. Believing the SUV driver intended to harm them or citizens to avoid arrest, the police officer shot at the SUV both during its approach and as it got away. The police officers believed the SUV driver shot at them while speeding past them in the alleyway. The SUV escaped with its driver suffering gunshot wounds. Detectives investigated and, several weeks later, arrested the same person driving the SUV both for the first shooting and the shootout with the police officers in the alleyway. The Commonwealth withdrew the charges relating to the first shooting before trial. The state court judge found the SUV driver not guilty on other charges but found the SUV driver guilty of aggravated assault.

The SUV driver now sues the police officers for excessive force during the shootout, the detective for false arrest and maliciously prosecution and the City for supervisory liability. After extensive discovery, we hold the officers are entitled to qualified immunity for excessive force liability and the SUV driver did not adduce evidence of false arrest, malicious prosecution or supervisory liability. We grant the motion for summary judgment dismissing the SUV driver's

remaining claims in the accompanying Order.

# I. Undisputed facts.

Officer Christopher Kertis, Officer Andrew Baker, and Detective Scott Evans serve as police officers for the City of Pittsburgh Bureau of Police. Upon joining the City, Officers Kertis and Baker completed five weeks of police academy training.[1] The City trained the Officers on topics including driving, rules and regulations, and the use of force.[2]

*The shootout in the alleyway.*

Shortly after 2:00 AM on September 9, 2012, Officers Kertis and Baker were working in the Homewood/Brushton section of Pittsburgh when they heard gunshots.[3] Officers Kertis and Baker were in their marked police van.[4] Officer Kertis drove toward the area of the shooting, where the officers saw muzzle flashes and heard gunshots coming from a dark-colored SUV.[5] Officer Kertis testified they were the loudest shots he ever heard.[6]

Without activating lights or sirens, the Officers drove toward the SUV, located in an alleyway about 100 to 200 yards away.[7] Officer Kertis cut through a parking lot to enter the alleyway.[8] The Officers lost sight of the SUV for a split second but continued to hear one or two gunshots as they chased the vehicle.[9]

Immediately upon entering the alleyway, Officer Kertis slammed on the brakes because he saw the SUV driving toward them.[10] While Officer Kertis started exiting the van, the SUV accelerated toward the Officers at a high rate of speed.[11] Officer Baker went behind the van.[12] Officer Baker, fearing the SUV would ram them, pulled out his gun and fired two or three shots at the SUV from the passenger window.[13] The SUV continued driving straight at the van before maneuvering around it at the last second.[14] While the SUV drove by the van, Officer Baker continued shooting at the SUV.[15]

As the SUV passed the police van, Officer Kertis saw the driver through the passenger window with something in his hand which appeared to be a gun.[16]  While Officer Kertis pulled his gun up, he saw a muzzle flash and heard a gunshot from the SUV.[17]  Officer Kertis shot back at the SUV as it continued driving away.[18]  Officer Baker exited the van and continued shooting at the SUV as it drove away.[19]

The Officers explained they continued shooting at the car out of public safety concerns. Officer Baker testified he continued shooting at the SUV "because he's a danger to the public at that point.  I believed he may have just shot somebody in the alleyway.  He failed to stop for us, and he continued on at that point.  You know, I felt he was a danger to the public."[20]  Officer Kertis testified he continued firing at the SUV "[f]or the safety of the public, to try to stop the threat. . . . He had just shot at me.  So letting somebody go out into the public, he might shoot somebody else, so you have to stop the threat."[21]

The Officers stopped shooting once the SUV reached the street they were previously patrolling.[22] The Officers returned to the van and set off toward the SUV, but they could not find it.[23]

As a result of the September 9, 2012 incident, Blair sustained four bullet wounds to his right arm, requiring surgery for his elbow.[24]  He claims severe shoulder and rotator cuff damage, deformity of the tricep muscle and severe scarring.  His injuries allegedly cause him physical and mental pain on a daily basis.[25]

*Arrest and prosecution.*

Paramedics arrived to the scene of the first shooting and found Ronald Thornhill with a gunshot wound to his arm.[26] Paramedics transported Mr. Thornhill to UPMC hospital, where he met with Detectives Clifton Pugh and Vonzale Boose.[27]  According to the detectives, after they

"explained why [they] were" at the hospital, Mr. Thornhill "mentioned a name."[28] When asked to repeat the name, Mr. Thornhill stated "Tay Blair."[29] Detective Pugh asked Mr. Thornhill "which one," to which he responded, "the older one, who was about 40 years old."[30] When the detectives asked Mr. Thornhill if he had seen Blair, Mr. Thornhill stated he did not, "but the black vehicle looked like the vehicle that Blair drives, a black Chrysler Pacifica."[31] Mr. Thornhill stated he did not have problems with Blair, but friends of his did.[32]

The detectives memorialized this discussion in a September 10, 2012 report. On October 24, 2012, after Mr. Thornhill had an opportunity to read the report, Mr. Thornhill signed the report but crossed off portions of the report implicating Blair.[33] Mr. Thornhill wrote in the margin next to the crossed off portions, "Never said this."[34]

Before Mr. Thornhill had an opportunity to review and sign the report, Detective Scott Evans prepared and filed a criminal complaint against Blair.[35] In the criminal complaint, dated September 28, 2012, Detective Evans accused Blair of aggravated assault and attempted homicide against Officer Kertis, Officer Baker, and Mr. Thornhill.[36] Detective Evans also accused Blair of two counts of assault of a law enforcement officer and one count of carrying a firearm without a license.[37]

In support of his criminal complaint, Detective Evans submitted an affidavit of probable cause referring to Mr. Thornhill's discussion with Detectives Pugh and Boose, but misstating the interaction as recorded in the report.[38] According to Detective Evans, "When the detectives asked Thornhill who shot him, he replied, 'Tay Blair. The older one. The one who's forty.'"[39] Detective Evans swore Mr. Thornhill "immediately recognized the vehicle as Blair's."[40]

In his affidavit, Officer Evans also swore he met with Officer Kertis on September 27, 2012 to see whether Officer Kertis could identify Blair from a photo array.[41] Officer Kertis positively identified Blair as the man who shot at him from the SUV that night.[42]

A magisterial district justice issued an arrest warrant based on the criminal complaint, and authorities arrested Blair on September 28, 2012.[43] On April 16, 2014, Judge Jeffrey A. Manning found Blair guilty of two counts of aggravated assault, one count of prohibited possession of a firearm, and one count of carrying a firearm without a license.[44] The Commonwealth withdrew aggravated assault and attempted homicide charges relating to Mr. Thornhill, and Judge Manning found Blair not guilty on the remaining charges.[45]

On October 29, 2014, Blair sued the City, the Pittsburgh Bureau of Police, and various police officers alleging they violated his constitutional rights.[46]

## II.      Analysis[47]

Officer Kertis, Officer Baker, Detective Evans, and the City seek summary judgment on Blair's remaining claims of excessive force against Officers Kertis and Baker, false arrest and malicious prosecution claims against Detective Evans, and a *Monell* supervisory liability claim against the City alleging the lack of a policy governing the use of firearms by the City and/or the failure to enforce existing policies and training Officers Kertis and Baker about the policies.[48]

### a.  Officers Baker and Kertis are entitled to qualified immunity as to the excessive force claim.

The Officers contend they are entitled to qualified immunity as to Blair's claims for excessive force. Blair counters the Officers "clearly violated [Blair's] constitutional rights by opening fire on [him] . . . without putting on any takedown lights, sirens, or giving any verbal commands for him to stop."[49] He also contends no reasonable officer "would continue to fire at a

suspect who was leaving the scene and not engaging them in any way."[50] Blair offers no precedential or persuasive authority. In light of Supreme Court precedent granting qualified immunity under similar circumstances involving suspects fleeing in a vehicle and Blair's failure to meaningfully distinguish his facts from Supreme Court precedent, we conclude Officers Baker and Kertis are entitled to qualified immunity.

A government official is entitled to qualified immunity if his "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."[51] A right is not clearly established "unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it."[52] In other words, the right must be "beyond debate" under existing precedent.[53] We must not "define clearly established law at a high level of generality."[54] Instead, we must consider the official's conduct within the "particular circumstances" he faced.[55]

The Supreme Court twice considered whether clearly established law prohibits police officers from firing at an individual fleeing in a vehicle, and both times it concluded no clearly established law prohibited the officers' actions. In *Brosseau*, the officer pursued plaintiff Haugen on foot with a warrant for his arrest.[56] During the pursuit, Haugen jumped into a Jeep and locked the doors.[57] Although the officer believed Haugen ran into the car to retrieve a weapon, she approached the Jeep and ordered Haugen at gunpoint to get out.[58] Haugen did not comply, prompting the officer to break the window and hit Haugen on the head with her gun.[59] At this point, Haugen started the car and began driving away.[60] The officer lined up behind the car and shot through the rear driver's side window, striking Haugen in the back.[61] The officer later explained she shot Haugen out of fear for the other officers and citizens that might be in the area.[62]

The Court of Appeals for the Ninth Circuit found the officer not protected by qualified immunity, but the Supreme Court reversed.[63]  The Court emphasized the qualified immunity inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition."[64]  Although prior case law clearly establishes "the general proposition that use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness,"[65] the qualified immunity analysis requires the right be clearly established in a more "particularized sense."[66]

The Court then reviewed cases cited by the parties from three different courts of appeals, but concluded these cases did not "squarely" govern Haugen's case.[67]  Two of these cases found no excessive force "when an officer shot a fleeing suspect who presented a risk to others."[68] The third case found summary judgment inappropriate on a Fourth Amendment claim involving a suspect fleeing in a vehicle because "the threat created by the fleeing suspect's failure to brake when an officer suddenly stepped in front of his just-started car was not a sufficiently grave threat to justify the use of deadly force."[69]  The Court explained these cases demonstrate "this area is one in which the result depends very much on the facts of each case."[70]  As none of these cases "squarely" governed Haugen's case, they did not show the officer's actions "fell in the 'hazy border between excessive and acceptable force.'"[71]

In *Plumhoff*, the Supreme Court found the officers—who shot the driver of a fleeing vehicle to end a dangerous car chase—did not violate the Fourth Amendment, or alternatively, were entitled to qualified immunity.[72]  Police officers pulled over Donald Rickard for a faulty headlight.[73]  An officer asked if Rickard had been drinking, which Rickard denied.[74]  After Rickard failed to produce his drivers' license, the officer asked him to step out of the car.[75] Instead, Rickard sped away.[76]  The officers then pursued Rickard in a high speed car chase

through traffic.[77]  During the chase, Rickard took a quick right turn, contacting a police cruiser and then spinning out into a parking lot where he collided with another police cruiser.[78]  Officers approached Rickard with their firearms while Rickard attempted to drive his car away in reverse.[79]  At that point, Rickard contacted another police cruiser.[80]  Rickard's tires started spinning, and his car rocked back and forth, indicating "Rickard was using the accelerator even though his bumper was flush against a police cruiser."[81]  An officer fired three shots into the car.[82]  Shortly afterward, Rickard turned the car around in reverse and drove onto the street, forcing one of the officers to move to avoid being hit by the vehicle.[83]  As Rickard drove away, the officers fired 12 shots at Rickard's car.[84]  Rickard then lost control, crashed the car into a building, and died from a combination of gunshot and crash wounds.[85]

The Supreme Court concluded the officers acted reasonably by using deadly force to address the "grave public safety risk" posed by Rickard's flight.[86]  The Court also concluded the officers acted reasonably by firing 15 total shots.[87]  "It stands to reason that, if police officers are justified in firing at a suspect in order to end a severe threat to public safety, the officers need not stop shooting until the threat has ended."[88]

The Court also held the officers entitled to qualified immunity explaining courts must not "define clearly established law at a high level of generality since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced."[89]  The Court concluded its decision in *Brosseau* "squarely demonstrates that no clearly established law precluded petitioners' conduct at the time in question."[90] The Court characterized its holding in *Brosseau*: "[A] police officer did not violate clearly established law when she fired at a fleeing vehicle to prevent possible harm to other officers on foot who she believed were in

the immediate area, . . . occupied vehicles in the driver's path, and . . . any other citizens who might be in the area."[91]

As the Court clarified in *Plumhoff*, for the citizen plaintiff to overcome qualified immunity in light of *Brosseau*, he needs to show either: 1) a material difference in the officers' conduct compared to the conduct in *Brosseau*; or, 2) "controlling authority" or a "robust consensus of cases of persuasive authority" emerging since *Brosseau* altering the qualified immunity analysis.[92] As to the first prong, the Court held the facts in *Plumhoff* are more favorable to the officers, as the driver in *Brosseau* had just begun to flee and had not yet driven his car in a dangerous manner.[93] As to the second prong, the citizen failed to cite any cases clearly establishing the "unconstitutionality of using of lethal force to end a high-speed car chase."[94]

Consistent with *Brosseau* and *Plumhoff*, we likewise conclude no clearly established law precludes qualified immunity applied to Officers Kertis and Baker's conduct. In *Brosseau*, the police officer did not violate clearly established law when firing at a fleeing vehicle to prevent possible harm to officers or citizens in the area.[95] Officers Kertis and Baker fired at Blair to protect the public.[96] As *Brosseau* applies to the present facts, Blair has the obligation under *Plumhoff* to either: a) show a material factual difference between his case and *Brosseau*; or, b) cite controlling or persuasive authority since *Brosseau* altering our qualified immunity analysis.[97]

Blair fails to cite a material fact difference between the officers' conduct here and in *Brosseau*. The officer in *Brosseau* fired at the fleeing vehicle in part to prevent harm to other officers.[98] Officers Kertis and Baker shot at Blair because they reasonably believed he posed a threat of harm to them by driving at them at a high rate of speed after having just seen Blair shoot at a private citizen.[99] They continued to fire at Blair as he sped away because of the threat

he posed to public safety.[100]   As Officer Kertis testified, "He had just shot me.   So letting somebody go out into the public, he might shoot somebody else, so you have to stop the threat."[101]   Officer Baker also testified Blair posed a danger to the public.[102]

Blair fails to cite analogous case law demonstrating the officers' use of deadly force violated a clearly established right.   Blair cites *Enyart* from the Court of Appeals for the Seventh Circuit, but it is distinguishable.[103]   In *Enyart*, the court of appeals denied qualified immunity because the officer created the need for deadly force by unreasonably stepping in front of a driver who had just began to flee in his car.[104]   Blair created the need for deadly force because he drove directly toward the Officers at a high rate of speed after having just shot at another person, causing the officers to believe Blair would hit them with the SUV or shoot them.[105]

Blair attempts to create a fact dispute as to whether he had actually fired a gun at the officers, but the evidence he cites does not create a genuine fact dispute.   Blair contends his use of a firearm is contradicted by the "ballistic evidence and crime scene photos."[106]   Blair does not explain what he means by ballistic evidence.   The record does not contain any ballistics reports or expert testimony, and Blair did not offer his version of the events at a deposition or otherwise.

The only evidence Blair cites are three crime scene photographs, which he claims show no damage to the police van and no "bullet holes or strike marks" on the building next to the van.[107]   All of the photographs, which were apparently taken at night, are dark and lack evidentiary quality.[108]   One photograph, taken from a distance from the van, shows the front of the police van with the brick façade of the building to the right.   At times, one can make out the mortar lines between the bricks, but the photograph fails to show the relevant portions of the façade with sufficient detail.   Another photograph shows the back and passenger side of the police van along with the corner of the building.   This picture is clearer, but still lacks sufficient

detail to determine the lack of "bullet holes or strike marks" on the building.[109]   The last photograph again shows the back and passenger side of the police van, but from a further distance.   These photographs fail to establish a genuine dispute as to whether Blair fired his weapon at the officers.

Blair also argues his acquittal for the charge of attempted homicide of a police officer demonstrates he did not fire a gun.[110]  This argument ignores Blair's convictions for aggravated assault.   The criminal complaint swears Blair "attempted to cause serious bodily injury to [the officers] or caused such injury intentionally, knowingly, or recklessly under circumstances manifesting extreme indifference to the value of human life."[111]    Blair's convictions for aggravated assault could be based on his use of a firearm, as we are unaware of any prosecution theory limiting these charges to Blair's conduct not involving a firearm.

Blair also argues Officer Baker admitted Blair did not have a firearm, but Blair mischaracterizes Officer Baker's deposition testimony.[112]    The portion cited by Blair demonstrates, at best, Officer Baker did not see anyone shooting at him:

Q       Did you ever see the vehicle – did the vehicle shoot at you?
A       Not at me, no.
Q       So the vehicle was passing you, was it shooting at you?
        Was anyone shooting at you?
A       Not that I saw.[113]

This testimony fails to create a genuine dispute as to whether Blair possessed or fired a firearm. We find no genuine issue of material fact precluding qualified immunity.

The undisputed facts confirm Officers Kertis and Baker shot at Blair after 2:00 AM when Blair drove a dark-colored SUV at them while sitting in a marked police van in an alleyway attempting to stop his escape from a possible crime scene. These facts again demonstrate the

peril in the emergency decisions made by police to protect citizens. Officers Kertis and Baker are entitled to qualified immunity on the excessive force claim.

**b. We grant summary judgment dismissing Blair's false arrest claim against Detective Evans.**

Blair's false arrest claim against Officer Evans fails because Officer Evans had probable cause to arrest Blair for the crimes for which he received convictions. An arrest warrant "does not, in itself, shelter an officer from liability for false arrest."[114] A defendant is insulated from § 1983 liability for false arrest where probable cause existed as to any offense that could have been charged under the circumstances.[115] A false arrest claim fails as a matter of law where the plaintiff is convicted of at least one charges for which he is arrested.[116]

Probable cause existed to arrest Blair for aggravated assault, as the state court judge found Blair guilty on those charges.[117] The conviction defeats his false arrest claim.

**c. We grant summary judgment dismissing Blair's malicious prosecution claim against Detective Evans.**

Officer Evans is not liable for malicious prosecution because he had probable cause to initiate proceedings against Blair. To prove malicious prosecution under § 1983, Blair must show: 1) Officer Evans initiated a criminal proceeding; 2) the criminal proceeding ended in Blair's favor; 3) Officer Evans initiated the proceeding without probable cause; 4) Officer Evans acted maliciously or for a purpose other than bringing the plaintiff to justice; and 5) Blair suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding.[118]

Blair satisfies the first element. Officer Evans initiated this criminal proceeding by submitting the criminal complaint against Blair.[119]

Blair satisfies the second "favorable termination" element, but only as to the charges the Commonwealth withdrew. Under the second "favorable termination" element, a favorable termination includes: a) a discharge at a preliminary hearing; b) the refusal of a grand jury to indict; c) the formal abandonment of the proceedings by the prosecutor; d) the quashing of an indictment or information; e) an acquittal; or f) a final order in favor of the accused by a trial or appellate court.[120]

A malicious prosecution claim "cannot be predicated on an underlying criminal proceeding which terminated in a manner not indicative of the innocence of the accused."[121] In determining whether a proceeding terminated in a way indicative of innocence, there is no categorical rule when the plaintiff receives a mixed verdict, *i.e.* when the plaintiff is acquitted on some charges and found guilty on others.[122] Rather, we must examine "the *entire* criminal proceeding" and determine whether the judgment indicates "the plaintiff's innocence of the alleged misconduct underlying the offenses charged."[123] A plaintiff with a mixed verdict can satisfy the favorable termination element "[w]hen the circumstances—both the offenses as stated in the statute and the underlying facts of the case—indicate that the judgment as a whole" reflects the plaintiff's innocence.[124] In other words, there are two inquiries: one inquiry into the elements of the crimes charged and a second inquiry "into the underlying conduct that the charges sought to punish."[125]

For example, in *Kossler*, our Court of Appeals determined the plaintiff—who received a mixed verdict—did not satisfy the favorable termination requirement because the charges in which he received convictions and the charges in which he received acquittals arose from the

same course of conduct.[126]   In *Kossler*, the plaintiff had an altercation with a police officer, resulting in charges for aggravated assault, disorderly conduct, and public intoxication.[127]   The plaintiff received an acquittal on aggravated assault and public intoxication charges, but a conviction for disorderly conduct.[128]   The court concluded the acquittals could not be divorced from the disorderly conduct conviction because "all three charges arose from the same course of conduct," the plaintiff's altercation with a police officer.[129]

We begin our inquiry with the offenses defined by the Pennsylvania General Assembly. The Commonwealth initially charged Blair with three counts of aggravated assault.   The Commonwealth withdrew one charge relating to the shooting of Mr. Thornhill, but Judge Manning convicted Blair on the other two charges.   A person is guilty of aggravated assault if he "attempts to cause serious bodily injury to another, or causes such injury intentionally, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life."[130]

Judge Manning also convicted Blair for carrying a firearm without a license.   A person is guilty of carrying a firearm without a license if he "carries a firearm in any vehicle or . . . carries a firearm concealed on or about his person . . . without a valid and lawfully issued license."[131]

The Commonwealth charged Blair with two counts of assault on a police officer and three counts of attempted homicide.   The Commonwealth withdrew one attempted homicide charge related to Mr. Thornhill's shooting, but Judge Manning found Blair not guilty of the remaining charges.   A person is guilty of assault on a police officer if he "attempts to cause or intentionally or knowingly causes bodily injury to a law enforcement officer, while in the performance of duty and with knowledge that the victim is a law enforcement officer, by discharging a firearm."[132]   A person is guilty of attempt "when, with intent to commit a specific

crime, he does any act which constitutes a substantial step toward the commission of that crime."[133]

Proceeding to our second inquiry, the events on September 9, 2012 demonstrate the Officers observed a shooting by an individual driving a dark colored SUV. Following, the police confronted the SUV in the alleyway. Blair drove his dark colored SUV toward Officers Kertis and Baker, resulting in the shootout.

The findings at the state court trial do not reflect Blair's innocence as to his altercation with Officers Kertis and Baker. Following a bench trial, Judge Manning found Blair guilty of aggravated assault, but found insufficient evidence Blair had specific intent to shoot the officers.[134] Judge Manning also found insufficient evidence Blair knew the persons he shot at were police officers.[135] Judge Manning found evidence Blair committed the aggravated assaults and the firearms violations "clear" and "beyond a reasonable doubt."[136] The charges pertaining to Blair's altercation with Officers Kertis and Baker all stem from the same course of conduct, *i.e.* Blair's confrontation with the officers while in the SUV and the subsequent shootout. Blair's acquittals do not reflect his "innocence of the alleged misconduct underlying the offenses charged."[137]

Blair's withdrawn charges for attempted homicide and aggravated assault demand a separate inquiry because these charges arise from a separate event—the shooting of Mr. Thornhill. None of the tried offenses sought to punish Blair for conduct relating to the shooting of Mr. Thornhill. The Commonwealth withdrew charges relating to Mr. Thornhill's shooting.[138] Because the Commonwealth withdrew these charges, they satisfy the favorable termination requirement.[139]

Blair's malicious prosecution claim fails under the third element because probable cause existed to arrest Blair for at least one of the charged offenses. For the purpose of determining whether probable cause supported Blair's arrest under the warrant, we must "separately analyze the charges claimed to have been maliciously prosecuted" and determine if each charge is supported by probable cause.[140] A finding of no probable cause as to one charge does not require dismissing the entire malicious prosecution claim.[141] Rather, we must "consider whether there was probable cause to initiate the criminal proceedings with respect to" each offense.[142]

We need not examine probable cause as to each offense if the circumstances leading to the arrest and prosecution "were totally intertwined."[143] In *Johnson*, our Court of Appeals found this rule inapplicable because the arresting officer arrested the appellant, but later took steps to supply information to the investigating detective, which led to the appellant's prosecution.[144] In *Startzell*, however, our Court of Appeals found this rule applicable where both the arrest and prosecution of the appellants arose from the circumstances leading officials to arrest in the first place.[145]

We need not examine probable cause as to each of the offenses against Blair because the circumstances leading to his arrest and prosecution "were totally intertwined."[146] Under the authority of the arrest warrant, officials arrested Blair for the crimes charged against him.[147] Blair's malicious prosecution claim is predicated on the allegedly false information contained in the arrest warrant. Blair did not allege Officer Evans supplied information following his arrest which led to an additional prosecution. As the circumstances leading to Blair's arrest and prosecution are intertwined, our finding of probable cause as to the charges for which he received convictions defeats his malicious prosecution claim.

### d. We grant summary judgment dismissing Blair's supervisory liability claim.

The City argues Blair fails to establish liability against it. Blair counters the City's policy with respect to use of firearms amounts to deliberate indifference to his constitutional rights. Blair further argues the City's failure to train, supervise, and discipline creates an atmosphere where officers are permitted to "shoot first, ask questions later."[148]

In *Monell*, the United States Supreme Court held a city may be liable under § 1983 when it causes the constitutional violation at issue.[149] To succeed on a *Monell* claim, Blair must establish: "(1) [he] possessed a constitutional right of which [he] was deprived; (2) the municipality had a policy; (3) the policy 'amounted to deliberate indifference' to [his] constitutional right; and (4) the policy was the 'moving force behind the constitutional violation.'"[150] "'Deliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action."[151]

Blair's *Monell* claim based on an unconstitutional policy fails for lack of evidentiary support as to the third "deliberate indifference" element. The City maintains a policy on the discharge of firearms. Blair contends this policy is "flawed and inadequate," but he fails to specify its faults, or more importantly, how it amounted to deliberate indifference of Blair's constitutional right to be free from excessive force.

With respect to the use of a firearm against a moving vehicle or its occupants, the City's policy prohibits the use of firearms "unless occupants are using deadly physical force against the officer or another person present by means other than the vehicle."[152] There is one exception to this rule: "a situation where a vehicle is being intentionally operated as a weapon and an officer, or a third party, is faced with immediate death or serious bodily injury and the officer has done everything reasonably necessary to avoid the use of deadly force."

Blair fails to explain how this City policy amounts to a deliberate indifference to his constitutional rights. Blair contends the policy's flaws are apparent by the multiple revisions it has undergone over the years, but we disagree. The City's decision to revise the policy does not permit a reasonable inference the policy in effect during the use of force against Blair contained unconstitutional infirmities. The City may have updated its policy to remain consistent with changes in the law.

Blair's *Monell* claim based on inadequate training, discipline, and supervision also fails for lack of evidentiary support. "Establishing municipal liability on a failure to train claim under § 1983 is difficult. A plaintiff pressing a § 1983 claim must identify a failure to provide specific training that has a causal nexus with their injuries."[153] Blair also "must demonstrate that the absence of that specific training can reasonably be said to reflect a deliberate indifference to whether the alleged constitutional deprivations occurred."[154] Blair must identify "the specific training the [City] should have offered."[155] "Mere proof that an injury could have been avoided if the municipal officer or employee 'had better or more training is not enough to show municipal liability' under a 'failure to train' *Monell* claim."[156]

Ordinarily, "[a] pattern of similar constitutional violations by untrained employees" is necessary "to demonstrate deliberate indifference for purposes of failure to train."[157] "Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights."[158] "A pattern of violations puts municipal decisionmakers on notice that a new program is necessary, and '[t]heir continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the

consequences of their action—the 'deliberate indifference'—necessary to trigger municipal liability.'"[159]

Absent a pattern of violations, a failure to train claim may proceed where (1) a constitutional violation is "a highly predictable consequence of a failure to equip law enforcement officers with specific tools or skills to handle recurrent situations," and (2) the likelihood of recurring violations justifies "a finding that the policymakers' decision not to train an officer reflected deliberate indifference" to the violation of a constitutional right.[160]

Blair contends the Officers' five weeks of police academy training on the use of force is constitutionally defective, but he fails to specify what made this training inadequate. Blair alleges, without citation, the City did not offer ongoing training on the use of force or the use of de-escalation techniques, and this lack of training established a custom and practice of officers who "shoot first, and ask questions later."[161] Blair also asserts he "might not have been injured that night" if the City "would have investigated, disciplined, or given additional training to" the Officers.[162] The lack of evidentiary support for these general allegations proves fatal to Blair's failure to train claim.

Blair does not demonstrate a pattern of constitutional violations sufficient to put the City on notice of its defective training or discipline. Blair attempts to show a pattern of violations demonstrating "the need for more or different training on the appropriate use of deadly force" by means of newspaper articles of shootings by Officers Kertis and Baker, but these articles fail to demonstrate a pattern of constitutional violations.[163] The articles demonstrate shootings by police, but they do not demonstrate the shootings amounted to constitutional violations.

These articles also constitute inadmissible hearsay, and in many cases double hearsay, because they are offered for the truth of the matter asserted.[164] Courts outside our Circuit have

refused to rely upon newspaper articles in support of a *Monell* claim.[165]  In this Circuit, "hearsay statements can be considered on a motion for summary judgment if they are capable of admission at trial,"[166] but Blair does not demonstrate how these newspaper articles would be admissible at trial.

Blair also does not demonstrate his injury is "a highly predictable consequence of a failure to equip law enforcement officers with specific tools or skills to handle recurrent situations."[167]  Training on the use of de-escalation techniques would not have prevented the use of force against Blair, as Blair instigated the Officers' use of force by driving toward them at a high rate of speed.

Blair also fails to demonstrate the City's failure to discipline or supervise Officers Kertis and Blair amounted to a deliberate indifference of Blair's constitutional rights.  Blair again relies on newspaper articles showing the City did not discipline the Officers following their shooting incidents.  But Blair fails to show the City should have disciplined the Officers for their conduct, as Blair does not demonstrate the unconstitutionality of the Officers' underlying conduct.

## III. Conclusion

We grant the Officers and City's motion for summary judgment in the accompanying Order.  Officers Kertis and Baker are entitled to qualified immunity on Blair's excessive force claim.  The false arrest and malicious prosecution claims against Detective Evans fail because authorities had probable cause to arrest and institute proceedings against Blair.  We also grant the City's motion for summary judgment.  Blair fails to provide evidentiary support the City had an unconstitutional policy or otherwise failed to train, discipline, or supervise its employees.

---

[1] ECF Doc. No. 77-2, at p. 2.

[2] *Id.*; ECF Doc. No. 54-3, at p. 2.

[3] ECF Doc. No. 59-23, at p. 7; ECF Doc. No. 54-2, at p. 3; ECF Doc. No. 59-3; ECF Doc. No. 59-27, at p. 3.

[4] ECF Doc. No. 54-6, at p. 8.

[5] ECF Doc. No. 59-5; ECF Doc. No. 54-2, at p. 3.

[6] ECF Doc. No. 59-5.

[7] ECF Doc. No. 54-2, at p. 3; ECF Doc. No. 59-5; ECF Doc. NO. 77-11, at p. 4.

[8] ECF Doc. No. 54-3, at pp. 5–6.

[9] *Id.* at p. 6; ECF Doc. No. 59-7.

[10] ECF Doc. No. 54-3, at p. 7.

[11] *Id.* at p. 8.

[12] *Id.* at p. 9.

[13] ECF Doc. No. 59-14; ECF Doc. No. 54-2, at p. 6.

[14] ECF Doc. No. 54-2, at p. 6.

[15] *Id.* at p. 8.

[16] ECF Doc. No. 54-3, at p. 10.

[17] *Id.* at pp. 10–11.

[18] *Id.* at pp. 11, 13.

[19] ECF Doc. No. 54-2, at p. 8.

[20] *Id.* at p. 9.

[21] ECF Doc. No. 54-3, at p. 13.

[22] *Id.* at p. 15.

[23] *Id.* at p. 15–16.

[24] ECF Doc. No. 59-25, at p. 2.

[25] ECF Doc. No. 77-15, at p. 1.

[26] ECF Doc. No. 54-5, at p. 1.

[27] *Id.*

[28] *Id.*

[29] *Id.*

[30] *Id.*

[31] *Id.*

[32] *Id.*

[33] *Id.*

[34] *Id.*

[35] ECF Doc. No. 54-6, at p. 1.

[36] *Id.* at pp. 2–3.

[37] *Id.*

[38] *Id.* at p. 9.

[39] *Id.*

[40] *Id.*

[41] *Id.*

[42] *Id.*

[43] ECF Doc. No. 59-25, at p. 2; ECF Doc. No. 77-15, at p. 1.

[44] ECF Doc. No. 54-7, at pp. 4–5.

[45] *Id.*

[46] ECF Doc. No. 1.

[47] Summary judgment is proper when there is no genuine dispute of material fact and the movant is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(a). A dispute as to a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986). On a motion for summary judgment, the court must consider the "underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Slagle v. Cnty. of Clarion*, 435 F.3d 262, 264 (3d Cir. 2006) (citations omitted). If the movant carries its initial burden of showing the basis of its motion, the burden shifts to the non-moving party to go beyond the pleadings and point to "specific facts showing that a genuine issue exists for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). In other words, the non-moving party "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue." *Podobnik v. US. Postal Serv*., 409 F.3d 584, 594 (3d Cir. 2005) (citation and internal quotation marks omitted). Summary judgment must be granted against a non-moving party who fails to sufficiently "establish the existence of an essential element of its case on which it bears the burden of proof at trial." *Blunt v. Lower Merion Sch. Dist*., 767 F.3d 247, 265 (3d Cir. 2014).

[48] ECF Doc. No. 29, at pp. 6–7.

[49] ECF Doc. No. 58, at p. 8.

[50] *Id.*

[51] *Berg v. Cty. of Allegheny*, 219 F.3d 261, 272 (3d Cir. 2000) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

[52] *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014) (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).

[53] *Id.*

[54] *Id.*

[55] *Id.*

[56] *Brosseau v. Haugen*, 543 U.S. 194, 196 (2004).

[57] *Id.*

[58] *Id.*

[59] *Id.*

[60] *Id.*

[61] *Id.* at 196–97.

[62] *Id.* at 197.

[63] *Id.* at 195.

[64] *Id.* at 198.

[65] *Id.* at 199.

[66] *Id.* (quotation marks omitted).

[67] *Id.* at 201.

[68] *Id.* at 200.

[69] *Id.* at 201 (citing *Estate of Starks v. Enyart*, 5 F.3d 230 (7th Cir. 1993)).

[70] *Id.*

[71] *Id.* (quoting *Saucier v. Katz*, 533 U.S. 194, 206 (2001)).

[72] *Plumhoff*, 134 S. Ct. at 2016–17.

[73] *Id.* at 2017.

[74] *Id.*

[75] *Id.*

[76] *Id.*

[77] *Id.*

[78] *Id.*

[79] *Id.*

[80] *Id.*

[81] *Id.* (internal citations and quotation marks omitted).

[82] *Id.*

[83] *Id.*

[84] *Id.* at 2018.

[85] *Id.*

[86] *Id.* at 2022.

[87] *Id.*

[88] *Id.*

[89] *Id.* at 2022–23 (internal citations and quotation marks omitted).

[90] *Id.* (quoting *Brosseau*, 543 U.S. at 197).

[91] *Id.* (quoting *Brosseau*, 543 U.S. at 197) (brackets and quotation marks omitted).

[92] *Id.* (quotation marks omitted).

[93] *Id.*

[94] *Id.* at 2024.

[95] *Plumhoff*, 134 S. Ct. at 2023 (quoting *Brosseau*, 543 U.S. at 197).

[96] ECF Doc. No. 54-3, at p. 13; ECF Doc. No. 54-2, at pp. 19–20.

[97] *Plumhoff*, 134 S. Ct. at 2023.

[98] *Brosseau*, 543 U.S. at 197.

[99] ECF Doc. No. 54-3, at p. 13; ECF Doc. No. 54-2, at pp. 19–20.

[100] ECF Doc. No. 54-3, at p. 13.

[101] *Id.*

[102] ECF Doc. No. 54-2, at p. 9.

[103] *Estate of Starks v. Enyart*, 5 F.3d 230, 234 (7th Cir. 1993).

[104] *Id.* (concluding "[p]olice officers who unreasonably create a physically threatening situation in the midst of a Fourth Amendment seizure cannot be immunized for the use of deadly force.").

[105] ECF Doc. No. 59-14; ECF Doc. No. 54-2, at pp. 8, 19–20.

[106] ECF Doc. No. 59, at ¶ 25.

[107] *Id.*

[108] ECF Doc No. 59-18.

[109] ECF Doc. No. 59, at ¶ 25.

[110] *Id.* at ¶ 26.

[111] ECF Doc. No. 54-6, at p. 2.

[112] ECF Doc. No. 59, at ¶ 20.

[113] ECF Doc. No. 59-15.

[114] *Reedy v. Evanson*, 615 F.3d 197, 213 (3d Cir. 2010) (quoting *Wilson v. Russo*, 212 F.3d 781, 786 (3d Cir. 2000)).

[115] *Johnson v. Knorr*, 477 F.3d 75, 85 (3d Cir. 2007).

[116] *See Lynn v. Schertzberg*, 169 F. App'x 666, 670 (3d Cir. 2006) (concluding as "apparent" the plaintiff's false arrest claim must fail because of his conviction of the charge against him, but remanding to the district court to determine this issue); *Berete v. Cortazzo*, No. 11-4111, 2012 WL 6628040, at *3 (E.D. Pa. Dec. 18, 2012) ("[T]he fact that the Plaintiff was acquitted of three of the eight charges made against him does not salvage his false arrest claim."); *Winston v. Bauer*, No. 9-224, 2010 WL 3811314, at *3 (W.D. Pa. Sept. 21, 2010) ("However, a lack of probable cause cannot be established where the plaintiff was convicted on the charge which served as the basis for his arrest.").

[117] ECF Doc. No. 54-7, at pp. 4–5.

[118] *Kossler v. Crisanti*, 564 F.3d 181, 186 (3d Cir. 2009) (quoting *Estate of Smith v. Marasco*, 318 F.3d 497, 521 (3d Cir. 2003)).

[119] ECF Doc. No. 54-6.

[120] *Donahue v. Gavin*, 280 F.3d 371, 383 (3d Cir. 2002).

[121] *Id.* at 187.

[122] *Kossler*, 564 F.3d at 188.

[123] *Id.* (emphasis added).

[124] *Id.*

[125] *Id.* at 189.

[126] *Id.*

[127] *Id.* at 184.

[128] *Id.*

[129] *Id.*

[130] 18 Pa. C.S.A. § 2702(a)(1).

[131] 18 Pa. C.S.A. § 6106(a)(1).

[132] 18 Pa. C.S.A. § 2702.1(a)(1).

[133] 18 Pa. C.S.A. § 901(a).

[134] ECF Doc. No. 54-12, at p. 2.

[135] *Id.*

[136] *Id.*

[137] *Kossler*, 564 F.3d at 188 (emphasis added).

[138] ECF Doc. No. 54-4, at p. 30.

[139] *See Donahue*, 280 F.3d at 383.

[140] *Johnson*, 477 F.3d at 85.

[141] *Id.*

[142] *Id.*

[143] *Id.* at 82 n.9; *see also Startzell v. City of Philadelphia*, 533 F.3d 183, 204 n.14 (3d Cir. 2008).

[144] *Johnson*, 477 F.3d at 82 n.9.

[145] *Startzell*, 533 F.3d at 191, 204 n.14.

[146] *Johnson*, 477 F.3d at 82 n.9.

[147] Authorities also charged Blair with illegal possession of a firearm upon finding a gun in his possession upon his arrest.

[148] ECF Doc. No. 59, at p. 12.

[149] *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 694 (1978); *see also City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989).

[150] *Vargas v. City of Philadelphia*, 783 F.3d 962, 974 (3d Cir. 2015) (quoting *City of Canton*, 489 U.S. at 389–91) (brackets omitted).

[151] *Id.* (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 410 (1997)) (brackets omitted).

[152] ECF Doc. No. 59-16, at p. 2.

[153] *Reitz v. Cty. of Bucks*, 125 F.3d 139, 145 (3d Cir. 1997) (citing *Colburn v. Upper Darby Township*, 946 F.2d 1017, 1030 (3d Cir. 1991)).

[154] *Id.* (citing *Colburn*, 946 F.2d at 1030).

[155] *Id.*

[156] *White v. Brommer*, 747 F. Supp. 2d 447, 463 n.42 (E.D. Pa. 2010) (quoting *Kline ex rel. Arndt v. Mansfield*, 255 F. App'x 624, 629 (3d Cir. 2007)); *see also City of Canton*, 489 U.S. at 391 ("Neither will it suffice to prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct.").

[157] *Thomas v. Cumberland Cty.*, 749 F.3d 217, 223 (3d Cir. 2014) (quoting *Connick v. Thompson*, 563 U.S. 51, 62 (2011)).

[158] *Id.* (quoting *Connick*, 563 U.S. at 62).

[159] *Thomas*, 749 F.3d at 223 (quoting *Bryan Cnty.*, 520 U.S. at 407).

[160] *White*, 747 F. Supp. 2d at 463 (quoting *Kline*, 255 F. App'x at 629) (brackets and quotation marks omitted).

[161] ECF Doc. No. 59, at p. 12.

[162] *Id.*

[163] ECF Doc. No. 65, at pp. 6–7.

[164] *Sec. & Data Techs., Inc. v. Sch. Dist. of Philadelphia*, 145 F. Supp. 3d 454, 463 (E.D. Pa. 2015).

[165] *See Media All., Inc. v. Mirch*, No. 09-0659, 2012 WL 162375, at *1 (N.D.N.Y. Jan. 19, 2012).

[166] *Shelton v. Univ. of Med. & Dentistry of New Jersey*, 223 F.3d 220, 223 n.2 (3d Cir. 2000).

[167] *White*, 747 F. Supp. 2d at 463 (quoting *Kline*, 255 F. App'x at 629) (brackets and quotation marks omitted).